MARY EILEEN KILBANE, J.:
{¶ 1} Defendant-appellant, Jeron D. High ("High"), appeals his convictions, resulting from a drive-by shooting in the city of Cleveland.
{¶ 2} In March 2017, High was charged in a nineteen-count indictment. He was charged with participating in a criminal gang; improper discharge into a habitation; six counts of attempted murder; eight counts of felonious assault; two counts of discharging a firearm on or near prohibited premises; and improper handling firearms in a motor vehicle. Thirteen of the counts carried a criminal gang specification and seventeen of the counts carried multi-year firearm specifications with the "drive-by shooting" enhancement.
{¶ 3} On the day of trial, High waived his right to a jury and the matter proceeded before the bench. The following evidence was adduced at trial.
{¶ 4} On October 4, 2016, at approximately 10:30 p.m., P.J.D. was sitting outside on the front stairs of her Cleveland home with her three-year-old daughter, S.D., and P.J.D.'s eighteen-year-old sister, W.D. As they were outside, she observed two teenage males run across her front yard. P.J.D. testified that the males were searching through a purse they stole from an unknown female. As she told the teenagers that they need to leave her property, a four-door vehicle pulled up in front of her home. The driver's side of the vehicle faced her home. A black male in the rear driver's side seat started shooting a gun from his window. P.J.D. testified the gunman was trying to shoot at the two teenagers. When P.J.D. got back inside the house, she realized that S.D. was shot. P.J.D.'s grandmother was on the phone *705 with 911 while P.J.D. performed CPR on S.D. S.D. bled from the back of her head and was gasping for air. P.J.D. testified that the bullet went from the back to the front of S.D.'s head. EMS arrived and rushed S.D. to the hospital where she had emergency surgery and placed on life support. S.D. has required over 20 brain surgeries since the incident. At the time of trial, P.J.D. testified that S.D. has been in the hospital since the incident.
{¶ 5} P.J.D.'s nine-year-old sister, E.D., while sitting in the living room, was also shot during this incident. P.J.D. testified that the bullet left a hole in E.D.'s lower back by her spine. E.D. was also taken to the hospital and required surgery to remove the bullet from her lower back.
{¶ 6} Cleveland Police Detective Robert Beveridge ("Detective Beveridge") investigated the matter. Detective Beveridge obtained surveillance footage from a neighbor's house, which showed two vehicles driving toward P.J.D.'s house at the time of the shooting. One of the vehicles pictured in the surveillance footage was a Honda Accord, which was later determined to be stolen from Avon Lake, Ohio. The other vehicle was a white jaguar.
{¶ 7} The Honda Accord was recovered by Lakewood police on October 11, 2016. Upon recovery, Avon Lake Police Detective Justin Ludwig ("Detective Ludwig") processed the vehicle for forensic and physical evidence. Detective Ludwig recovered an android cell phone and a 9 mm bullet from the Honda Accord. The subscriber name associated with the android phone was "Jay Doe," which is High's nickname. Detective Ludwig later learned from the owner of the Honda Accord that a different cell phone saved as "Jaydoe's iPhone" was synced to the car's Bluetooth function.
{¶ 8} Codefendant, D.W., testified that he was friends with High and codefendant, J.J. On October 4, 2016, High, D.W., and J.J. drove around the westside of Cleveland in a Honda Accord that D.W. stole around October 3, 2016. D.W. was driving the vehicle, High was the front seat passenger, and J.J. was in the backseat. J.J. wanted to drive around the Denison Avenue area because he was looking for someone named "Bo-Bo." D.W. testified that High, J.J., and himself were members of the "Detroit Taking Over" or "DTO" gang. DTO had a rivalry with a gang from Denison. D.W. testified there were multiple shootings between DTO and Denison members. D.W. further testified that J.J. kept saying "let's go" look for rival gang members, and he and High "agreed to it after that."
{¶ 9} Accompanying the Honda was a white Jaguar. B.Y., who is a also a member of DTO, was the driver of the white Jaguar and had three other males in the car with him. D.W. testified that both vehicles pulled into a gas station. D.W. initially testified that while at the gas station, J.J. got out of the Honda, walked over to the Jaguar, and began talking to B.Y. B.Y. then gave J.J. a gun. D.W. later testified, however, that he was mistaken and that B.Y. gave him the 9 mm handgun, which he placed in the middle of the vehicle. They then drove the two vehicles into Denison territory so that they could fight the "dudes from Denison."
{¶ 10} Eventually, both the Honda Accord and the Jaguar drove to the area of West 73rd and Dudley Avenue. D.W. was following B.Y. at the time. As D.W. was driving, J.J. said "[t]here he go." J.J. was referring to "Bo-Bo and them." D.W. then slammed on the brakes and J.J., who was in the back seat, grabbed the gun from between the driver and front passenger seat. D.W. acknowledged that he previously told law enforcement and testified in juvenile court that High passed the gun to *706 J.J. At High's trial, he testified that High did not pass J.J. the gun. D.W. testified that J.J. then started shooting towards the residence at 7316 Dudley Avenue. D.W. drove away after J.J. fired the gun.
{¶ 11} B.Y. testified that he is friends with J.J., D.W., and High. B.Y. testified that he was with J.J., D.W., and High on October 4, 2016. He was driving a Jaguar and D.W. was driving a Honda Accord. On that day, B.Y. was carrying a beige and black 9 mm handgun with a red beam and flashlight attached. B.Y. testified that he gave the gun to High prior to the shooting. B.Y. further testified that he gave High the gun because High had a "little beef" with Denison members and High knew Denison members "don't fight. They shoot." B.Y. testified that the Denison members have shot at him before, along with J.J., and their friend, Deondre Arnold ("Dre"). When they approached the area of Dudley Avenue and West 73rd, the Honda Accord was following his vehicle. As he approached the street corner, he heard gun shots and thought somebody was shooting at his vehicle.
{¶ 12} The state presented evidence linking High to B.Y.'s 9 mm handgun. Detective Beveridge testified that High sent a private Facebook message to "LOH Keese" on October 15, 2016, with a photograph of a gun that was "very similar" to B.Y.'s 9 mm. B.Y. also identified his 9 mm handgun in a photograph of a firearm from High's Facebook page. In a photograph of High and D.W., B.Y. identified his 9 mm handgun, which High was displaying.
{¶ 13} The state also presented evidence on the DTO gang. Detective Beveridge testified to High's involvement in the DTO and the Heartless Felon criminal gangs. Detective Beveridge further testified that DTO's rival gang is the Denison Boys, also known as "So Paid Entertainment" or "SPE." According to Detective Beveridge, there have been several shootings between members of the Denison Boys and DTO. One specific shooting involved Dre and Bo-Bo. Bo-Bo is believed to have shot Dre. In a September 9, 2016 private Facebook conversation between J.J. and High, they discussed "going to war" with Denison members. J.J. states to High "we blowing Denison up you geeked me and Quano just went to war." High responded, "[t]onight we trying to get armor dude" and then sends J.J. a photograph of a large rifle.
{¶ 14} Detective Beveridge testified that High, B.Y., and J.J. were involved in a "shoot-out" with the Denison Boys on November 3, 2016, which was one month after the incident on Dudley Avenue. Detective Beveridge testified that High, J.J., B.Y., and another friend were in Denison territory near West 99th and Denison when the "shoot-out" occurred. B.Y. was shot at this time.
{¶ 15} Detective Beveridge further testified about a private Facebook conversation on November 3, 2016. In the conversation, High was told that B.Y. was in the hospital after being shot. High sent a message later that day to B.Y.'s account that it was "SPE" who shot B.Y. High knew "for sure I seen them[,] I never ran." High and Antonio Diggs, a DTO member, also discussed the November 3rd "shoot-out." High messaged Diggs "[f]or sure SPE gotta die."
{¶ 16} The state also introduced several jail calls made by High as evidence at trial. In one jail call, High requested B.Y. fill out an affidavit and withdraw his previous statement to law enforcement. In another jail call, High asked an unknown party to deactivate his Facebook account.
{¶ 17} At the conclusion of the bench trial, the court found High guilty of all counts and specifications. The trial court *707 sentenced High to an aggregate of 18 years in prison.
{¶ 18} High now appeals, raising the following two assignments of error for review.
Assignment of Error One
[High's] convictions were based upon insufficient evidence to sustain the convictions. The trial court erred by denying [High's] Crim.R. 29 motion on all counts when the state failed to prove with sufficient evidence that [High] aided and abetted the offenses.
Assignment of Error Two
[High's] convictions were against the manifest weight of the evidence.
Sufficiency of the Evidence
{¶ 19} In the first assignment of error, High argues the state failed to produce sufficient evidence that he aided and abetted in the charged offenses.
{¶ 20} In State v. Diar , 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, the Ohio Supreme Court explained the standard for sufficiency of the evidence as follows:
Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. State v. Thompkins , 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks , 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
{¶ 21} We are mindful that in considering the sufficiency of the evidence a certain perspective is required. State v. Eley , 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978). "This court's examination of the record at trial is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " Id. , quoting Atkins v. State , 115 Ohio St. 542, 546, 155 N.E. 189 (1926). It is the minds of the trier of fact, rather than a reviewing court, that must be convinced. State v. Thomas , 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).
{¶ 22} Here, High's convictions were premised on High aiding and abetting in the drive by shooting. It is well established that "a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission[.]" State v. Herring , 94 Ohio St.3d 246, 251, 762 N.E.2d 940 (2002). Ohio's complicity statute, R.C. 2923.03(A)(2), provides: "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." In State v. Johnson , 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus, the Ohio Supreme Court held:
To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.
{¶ 23} Aiding and abetting may be shown by both direct and circumstantial evidence, and " '[p]articipation in criminal intent may be inferred from presence, *708 companionship, and conduct before and after the offense is committed.' " State v. Cartellone , 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), quoting State v. Pruett , 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). However, "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." State v. Widner , 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982).
{¶ 24} We find Johnson instructive. In Johnson , members of the Bloods gang opened fire on members of the Crips. Edward McGaha ("McGaha"), a member of the Crips, was wounded. The defendant, Leslie Johnson ("Johnson"), was a member of the Crips gang and was present during the attack. Id. One of the primary shooters in the attack was Richard Miles ("Boom"), who was a Bloods gang member. Id. at 797.
{¶ 25} Later that day, McGaha returned home from the hospital and was sitting on the front porch of his mother's home with some other Crips gang members and associates, including Johnson, when a carload of Bloods pulled up and opened fire a second time. The Crips returned fire. No one was injured in the exchange. After this second exchange of gunfire, Johnson, McGaha, and other associates discussed how they were going to go after Boom for his involvement in the shooting. Id. at 797-798.
{¶ 26} Johnson was a passenger in a caravan of three vehicles filled with Crips members that drove to Bloods' territory. Johnson sat in the backseat of a stolen car. The front seat passenger had a .45 automatic handgun. They were looking for Boom and planned to shoot him if they found him. Id. at 798.
{¶ 27} The stolen car pulled up to an apartment complex that Boom was known to frequent. Three individuals were on the back porch of the apartment complex and individuals were inside the apartment. The passenger sitting next to Johnson asked "where is Boom?" One individual replied, "he don't live here." The passenger said, "well, tell Boom this" and opened fire. Three individuals were wounded and a three-year-old child was killed. Id.
{¶ 28} Johnson argued that since no witness pinpointed a specific statement by him of his intent to join the plan to kill Boom, there was insufficient evidence to support a conviction for complicity based on aiding and abetting. Id. at 801. The Ohio Supreme Court disagreed, stating that Johnson's position "defies not only the law but common sense." Id.
{¶ 29} The court found that Johnson was more than a mere bystander-he intended to assist with the murder of Boom. Id. at 800. Johnson was a member of the Crips gang involved in three separate gang-related shootings in a 24-hour period. The court stated, Johnson "went along on that fateful night as protection and support for his fellow gang members who had recently been 'disrespected.' He also had his own reason for revenge, as he himself had been shot at earlier that day." Id. Johnson rode around town in areas known to be frequented by rival Bloods gang members for over an hour looking for Boom. Id. The court emphasized that Johnson could have abandoned the plan to kill Boom at several points throughout the day, but instead chose to continue on with the three-car caravan in search of Boom. Id.
{¶ 30} Similarly, in the instant case, High argues there was no testimony or evidence that he incited, advised, encouraged, or shared in J.J.'s criminal intent and that he was an innocent bystander. A review of the record, however, reveals sufficient *709 evidence to conclude that High aided and abetted in the drive-by shooting.
{¶ 31} Here, High went along as protection and support for his fellow DTO gang members who had recently been "disrespected" by a rival gang-Denison Boys. DTO members believed that a Denison Boy member Bo-Bo shot Dre. Similar to Johnson , DTO members drove in a stolen vehicle to areas known to be frequented by Denison Boy gang members looking for Bo-Bo. D.W. testified it was J.J.'s idea to go to Denison territory. D.W. further testified that all occupants of the stolen Honda Accord, including High, agreed to drive around looking for rival Denison members, stating "if one is looking, we're all looking" for Denison Boy members.
{¶ 32} High could have abandoned the plan to locate Bo-Bo, but instead agreed to continue on with the two-car caravan in search of Bo-Bo and other Denison Boy gang members. As the occupants of the Honda Accord drove around looking for Denison members, they had B.Y.'s loaded 9 mm handgun in their vehicle. A rational trier of fact could find that High provided "protection and support" to the principal and played a strong role in facilitating the commission of the offense.
{¶ 33} Furthermore, the evidence at trial established that High's involvement in the November 3, 2016 shooting is strongly corroborative of his intent in the instant case. Detective Beveridge testified that High, B.Y., and J.J. were involved in a "shoot-out" with the Denison Boys approximately one month later. Detective Beveridge testified that B.Y. was shot during this encounter with Denison Boy members. Detective Beveridge described a Facebook message where High admitted to being present at the "shoot-out" with Denison Boy members. High's Facebook messages detailed DTO's rivalry with the Denison Boys and his direct participation in that rivalry.
{¶ 34} Based on the foregoing, the evidence established that High was more than a mere bystander. Like the defendant in Johnson , High could have abandoned the plan to locate Bo-Bo, but instead agreed to continue on with the two-car caravan in search of Bo-Bo and other Denison gang members. High, with a loaded firearm next to him in the vehicle, drove around with other DTO gang members into areas frequented by Denison Boy members. Furthermore, High's Facebook records reveal that he shared the criminal intent of the principal during the shooting. The state presented sufficient evidence that High aided and abetted in the charged offenses.
{¶ 35} Accordingly, the first assignment of error is overruled.
Manifest Weight of the Evidence
{¶ 36} In the second assignment of error, High argues that his convictions are against the manifest weight of the evidence.
{¶ 37} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. State v. Bowden , 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, 2009 WL 2186608, ¶ 13, citing Thompkins , 78 Ohio St.3d at 390, 678 N.E.2d 541. The Ohio Supreme Court in State v. Wilson , 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, has stated:
[T]he reviewing court asks whose evidence is more persuasive-the state's or the defendants? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."
*710 [ Thompkins at 387, 678 N.E.2d 541 ], citing Tibbs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.
{¶ 38} Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that " 'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " Thompkins at 387, 678 N.E.2d 541, quoting State v. Martin , 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for " 'the exceptional case in which the evidence weighs heavily against the conviction.' " Id. , quoting Martin .
{¶ 39} We note that when considering a manifest weight challenge, the trier of fact is in the best position to take into account inconsistencies, along with the witnesses's manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible. State v. Kurtz , 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, 2013 WL 3582078, ¶ 26 ; see also State v. Lilliard , 8th Dist. Cuyahoga Nos. 99382, 99383, and 99385, 2013-Ohio-4906, 2013 WL 5970247, ¶ 93 (In considering the credibility of witnesses on a manifest weight challenge, an appellate court is "guided by the presumption" that the jury, or the trial court in a bench trial, is " 'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " Id. , quoting Seasons Coal Co. v. Cleveland , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984) ). Therefore, we afford great deference to the factfinder's determination of witness credibility. State v. Ball , 8th Dist. Cuyahoga No. 99990, 2014-Ohio-1060, 2014 WL 1340226, ¶ 36.
{¶ 40} High argues that B.Y.'s testimony lacked credibility because he had reason to testify for the state. Here, B.Y. testified that he gave High his 9 mm handgun prior to the shooting. At trial, D.W. testified that J.J. grabbed the 9 mm handgun in the car when he believed he saw Bo-Bo. However, D.W. acknowledged that he previously told law enforcement that High passed J.J. the gun. D.W. also acknowledged he previously testified in juvenile court that High passed the gun to J.J. As the trier of fact, the trial judge could weigh B.Y.'s testimony with the conflicts in D.W.'s testimony to determine B.Y.'s credibility. We note that "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan , 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986), citing Seasons Coal Co. ; Henkle v. Salem Mfg. Co. , 39 Ohio St. 547 (1883). In light of the foregoing, when considering the credibility of B.Y. and D.W. and resolving the conflicts in the evidence, we do not find that the trial court clearly lost its way in convicting High.
{¶ 41} Accordingly, the second assignment of error is overruled.
{¶ 42} Judgment is affirmed.
EILEEN A. GALLAGHER, A.J., and PATRICIA ANN BLACKMON, J., CONCUR