[Cite as *State v. Shepard*, 2023-Ohio-4791.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

    v.                                        :

No. 112225

ROBERT SHEPARD,                     :

    Defendant-Appellant.      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 28, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-664741-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt and Ayoub Dakdouk, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

ANITA LASTER MAYS, A.J.:

**{¶ 1}** Defendant-appellant Robert Shepard ("Shepard") appeals his convictions for multiple offenses arising from the shooting of Frank Q. Jackson ("victim"). We affirm the trial court's judgment.

## I.  Summary

{¶ 2}  On September 19, 2021, the victim was shot and killed on Anita Kennedy Road in Cleveland Metropolitan Housing Authority's ("CMHA") Garden Valley area.  Less than two hours before that shooting, a 12-year-old male ("Doe") was shot multiple times at Cleveland's Lonnie Burten Recreation Center and Park ("Burten Center"), an area from which the victim had recently departed.  The Cleveland Police Department ("CPD") suspected that the shooter intended to kill the victim at the Burten Center, shot Doe due to mistaken identity, and completed his quest a short while later.

{¶ 3}  CPD investigated, and the CPD real time crime center ("RTCC") compiled video footage from Cleveland and CMHA cameras. CPD posited that Shepard aided or abetted the murder of the victim by leaving the victim's dirt bike in a CMHA housing area located on Anita Kennedy Avenue with knowledge that the victim would be shot by others when he appeared to retrieve it.  When the victim approached the bike, the shooter exited a silver Chrysler parked on the street in front of the walkway where the state asserted the bike was purposely placed by Shepard. The victim was shot multiple times and died at the scene.

{¶ 4}  The defense argued and CPD testimony confirmed, there was no direct evidence to support the elements of the convictions.  The defense claimed the evidence demonstrated Shepard was not the shooter and was not at the scene at the time the victim was shot.  The defense also contended the state failed to show that Shepard knew the identity of the shooters.

{¶ 5} Shepard was arrested on October 27, 2021. On November 4, 2021, Shepard was indicted for:

Count 1: Aggravated murder in violation of R.C. 2903.01(A), an unclassified felony,

Count 2: Murder in violation of R.C. 2903.02(B), an unclassified felony,

Count 3: Felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony,

Count 4: Felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony.

Each count included one- and three-year firearm specifications.

{¶ 6} The case was placed on the court's mental-health docket. The jury trial commenced on October 24, 2022, and on October 31, 2022, the jury rendered a verdict of guilty on all counts. Counts 2, 3, and 4 merged with Count 1. The state elected to sentence on Count 1 and the three-year firearm specification. On November 15, 2022, Shepard was sentenced to serve the three-year firearm specification prior and consecutive to the base sentence of life with the possibility of parole in 30 years for a total term of life with the possibility of parole in 33 years. Shepard received jail-time credit for 384 days. Court costs were imposed but fines waived.

{¶ 7} Shepard appeals.

## II. Assignments of Error

I. The trial court erred when it denied appellant's motion for judgment of acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

II. Appellant's convictions are against the manifest weight of the evidence.

III. The court erred by allowing the State to elicit inadmissible hearsay testimony from the witnesses over defense objections and depriving appellant of due process and a fair trial in violation of his federal and state constitutional rights.

## III. Discussion

### A. Sufficiency and manifest weight of the evidence

{¶ 8}   The first two errors challenge the sufficiency and manifest weight of the evidence and have been combined to facilitate our analysis.  We find that the assigned errors lack merit.

#### 1.  Standard of review

{¶ 9}   "Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense." *State v. Hoskin-Hudson*, 8th Dist. Cuyahoga No. 103615, 2016-Ohio-5410, ¶ 7.  "[A]n appellate court reviews a trial court's denial of a defendant's motion for acquittal using the same standard it applies when reviewing a sufficiency-of-the-evidence claim." *Id.*

{¶ 10}   "'Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 23, quoting *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).

{¶ 11} "'[W]hen reviewing the sufficiency of the evidence to support a criminal conviction'" the function of an appellate court "'is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id*. at ¶ 24, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds* as stated in *Smith* at 102, fn. 4.

{¶ 12} "'[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), followed.)'" *Id*., quoting *id.*

{¶ 13} In contrast to an appellate court's sufficiency of the evidence inquiry of whether the state met its burden of production at trial, a manifest weight of the evidence inquiry asks whether the state met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring.)

{¶ 14} In conducting a manifest weight inquiry, a reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Id*. at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 15} "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the trier of fact." *Id.*, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21. Thus, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances where the evidence presented at trial weighs heavily against the conviction. *Thompkins* at 388.

## 2. The trial

{¶ 16} DaNesha Terrell ("Terrell") testified that she, her mom, and others ran to the Burten Center to check on family and friends after being notified that shots had been fired. Her family was fine, but she saw a young male lying on the ground.

{¶ 17} Terrell ran into the victim who she "practically grew up" with. She could not recall what he was wearing. The victim, who lived in the East 38th Street area about eight blocks from the Burten Center, asked Terrell for a ride to pick up his dirt bike. Terrell and her brother drove the victim to a street called Sidaway Avenue in the Garden Valley area, about a five-minute drive from the Burten Center.[1] The only time the victim used his cell phone was as he exited the car, and Terrell overheard him ask someone "where['s] the bike at?" Tr. 351.

{¶ 18} The victim asked her to wait until he retrieved his bike. Terrell looked at her phone momentarily, saw that her mother was calling, heard shots, and looked

---

[1] Sidaway Avenue intersects Anita Kennedy Avenue, the street where the shooting occurred.

up to see the victim on the ground. Terrell quickly pulled away from the area and called 911 and the victim's sister.

{¶ 19} The 9:03 p.m. 911 call was played for the jury (exhibit No. 72). Terrell asked for police assistance for a shooting at East 72d Street and Sidaway Avenue and advised that the shooter was in a gray Chrysler 300 with dark-tinted windows, and was wearing Timberland boots, light blue jeans, a white pullover hoodie, and a yellow face mask. Terrell did not provide her real name due to an outstanding warrant involving a diversion program and was not receiving consideration for her testimony.

{¶ 20} Terrell reviewed the CMHA portions of the CPD/CMHA video compilation (exhibit No. 98). Terrell identified arriving in her mother's car and the victim exiting her car. Terrell pulled her car up in the middle of the street beside the gray Chrysler parked to her left to wait for the victim. She and the driver could not see each other due to the tinted windows. Terrell remained in the spot until the shots were fired. Terrell did not know who the victim talked with when asking about the bike or whether the call was made by the victim or was incoming.

{¶ 21} Terrell's mother Shaunte Hooks ("Hooks") confirmed the encounter with the victim at the Burten Center and that she allowed Terrell to use her car to drop off the victim and stated that she could not recall what the victim was wearing. Terrell later returned home crying that the victim had been shot. Hooks did not see anyone riding a dirt bike that day.

{¶ 22} Janesha Jackson ("Jackson") testified that the victim was her brother with whom she was very close. At about 1:00 p.m., the victim arrived at the stadium parking lot where Jackson and friends were tailgating. They lived on the same street, and Jackson's husband drove Jackson and the victim home about 4:00 p.m. The victim went home, changed clothes, and left for the Burten Center on his dirt bike wearing a black shirt and red Adidas jogging pants. Jackson learned of the shooting when called by Terrell.

{¶ 23} Jackson identified the victim's dirt bike in a video frame photograph (exhibit No. 80). The photograph was taken in front of a gas station located at East 55th Street and Woodland Avenue with a time stamp of 7:08 p.m. Jackson said the individual riding the bike was not the victim.

{¶ 24} Sergeant detective Ashley Jaycox ("Det. Jaycox") of the CMHA police department stated the department handles all felonies except homicides, which were handled by the CPD homicide unit. The security camera systems are motion activated though the newer system includes cameras with 24/7 recording. Det. Jaycox provided the CMHA portions of the CPD video. The cameras where the incident occurred only captured activity that was "big enough and close enough to the camera." Tr. 386. The detective had no other involvement with the investigation.

{¶ 25} Dr. Erica Armstrong ("Dr. Armstrong") was employed by the Cuyahoga County Medical Examiner's Office as a forensic pathologist and deputy

medical examiner at the time of the incident. Her primary responsibilities were to determine the cause and manner of death.

{¶ 26} The doctor testified that EMS was unable to revive the victim at the scene. Gunshot wounds were located in the right forehead, right temple, upper part of the right arm, back of upper part of right arm, right arm, upper lip, and left back. Testimony was also provided regarding autopsy photographs of the injuries and recovery of bullet fragments. The shots were generally from close range and were the official cause of death.

{¶ 27} Curtiss Jones, supervisor of the trace evidence unit of the Cuyahoga County Medical Examiner's Office, testified that his duties included the collection and analysis of trace evidence such as fibers, hairs, debris, and bullet holes from the decedent's body and clothing. The decedent was wearing a black t-shirt, red sweatpants, underwear, socks, shoes, and a head covering. Samples were transferred to the DNA laboratory for testing.

{¶ 28} CPD detective Robby Prock ("Det. Prock") responded to the scene along with detectives Peoples and Connole. Det. Prock described the photographic exhibits of the scene and evidence markers (exhibit Nos. 1-71). The shooting took place in a walkway area between the townhouse style buildings with decorative fencing located to the left and right of the walkway. The dirt bike was behind the fence portion to the right. The walkway extended from Anita Kennedy Avenue to the parking lot behind the buildings. DNA swabs were taken from four Sellier and Bellot .40 caliber Smith & Wesson casings, one Blazer .40-caliber Smith & Wesson

casing, the dirt bike, and cell phone collected at the scene. A gas can that detectives were advised could be relevant to the investigation was also swabbed.

{¶ 29} The shooting occurred five to six feet from the first-floor window of the townhouse unit to the right of the building, and an occupant would potentially have heard the encounter. Det. Prock estimated that the gas can was located 8 to 12 housing units from the scene.

{¶ 30} CPD detective Kevin Warnock ("Det. Warnock") with the gang impact unit responded to the scene while it was being secured. He and other CPD personnel interviewed residents and bystanders and canvassed the area for witnesses. Generally, people did not want to be seen cooperating with police or simply refused to speak. CPD initially believed the victim was the "sole operator of the bike throughout the incident." Tr. 498. Information was received that he was not. The gas can was recovered from the residence of Kimberlie Davis who police interviewed twice. Based on the interviews, Shepard became a person of interest

{¶ 31} Kimberlie Davis ("Davis") reluctantly testified that she knew Shepard through her friend who had a child with Shepard. Davis initially advised police that Shepard had touched the gas can that police took as evidence. Shepard was at the house while it was light outside, and Davis gave him something to eat. Davis stated she did not see Shepard with the bike and later said she only saw Shepard with the bike during the day.

{¶ 32} During cross-examination, Davis added that Shepard was cool and calm during the visit and came alone. The gas can that was recovered by CPD

belonged to her, but she did not know whether the can was full or empty when Shepard was there, whether Shepard obtained gas, or whether he returned to her house again that day.

{¶ 33} CPD investigative research analyst Macie Pierse ("Pierse") was employed with the RTCC that assisted with video evidence including creating compilations. Pierse prepared the video compilation exhibit in the instant case. Pierse also authored a report of the camera views that she examined to prepare the compilation, created a map identifying the camera locations, and a list of the 58 video clips selected to complete the video.

{¶ 34} Pierse stated that the time stamps on the CPD video clips were accurate and in sequential time order as much as possible but could not say that the same was true for the motion-activated CMHA clips. Pierse was aware that investigators thought the shootings of the victim and at the Burten Center were related.

{¶ 35} Pierse described the video compilation for the jury. Pierse stated the scene of a male crossing a CMHA parking lot near East 40th and Bohn Avenue was the male who later shot Doe at the Burten Center. Several clips at the beginning of the compilation depicted a black male in a white shirt who was riding the victim's dirt bike in the general area of East 49th Street and Outhwaite Avenue at approximately 7:34 p.m. to 7:46 p.m.

{¶ 36} A clip from a camera located at the East 46th Street entrance of the Burten Center showed the victim walking down East 46th Street at 7:51 p.m. looking

at or talking on his cell phone. He was wearing tennis shoes, a black shirt, red sweatpants, and a black hair cap.

{¶ 37} The next clip was of Doe, described by the witness as, "wearing red pants with a white stripe and a white and red or black striped shirt," walking through the baseball field at the Burten Center. Tr. 536. At 7:53 p.m., the victim was walking through the playground area of the Burten Center and interacting with his cell phone. On parallel walkways divided by tall, thick shrubs, the victim was leaving the playground area as Doe entered.

{¶ 38} Also, at 7:53 p.m., the "suspect shooter" was captured by the camera in front of the Burten Center walking down East 46th Street, the same street the victim walked down, as though following the victim. At 7:54 p.m., Doe was walking out of the playground area toward the street when the shooter walked up to him and fired until Doe fell. The shooter ran back up East 46th Street. People began running through the park, including the victim, and gathered near the football field sign. At 7:56 p.m., the gray Chrysler drove through the immediate area and the Scoville Avenue portion of the Burten Center parking lot as others ran from the park to the Outhwaite Homes CMHA property adjacent to the Burten Center.

{¶ 39} At 8:03 p.m., the victim and several others assisted an individual who was also wounded by the gunfire into a red car that was flagged down at East 55th Street and Outhwaite Avenue. Tr. 551. Also, at 8:03 p.m., another clip depicted the Chrysler stopping at the light, then proceeding through the intersection of East 55th

Street and Quincy Avenue. The Chrysler proceeded east on Quincy Avenue and, at 8:04 p.m., was at Quincy Avenue and Opportunity Corridor Boulevard.

{¶ 40} The video review shifted to an 8:50 p.m. clip at East 55th Street and Outhwaite Avenue where the dirt bike and alleged rider Shepard were headed toward East 55th Street and Kinsman Avenue. The remaining video was from CMHA motion clips and activities on Anita Kennedy Road at cited points of the 24:10 minute video and focused on the dirt bike rider, the victim, and the Chrysler.

{¶ 41} Pierse described:

21:52 – "[W]e are seeing a dirt bike and dirt bike rider that are entering the scene from the west going eastbound."

22:20 – "[T]he silver Chrysler 300 is driving westbound on Anita Kennedy" "and stopped next to the black vehicle." "Looks like they may have been talking."

22:28 – "[T]he [Chrysler] vehicle is backing up down the street and it looks like the dirt bike rider is no longer on the dirt bike but is walking next to that [Chrysler] vehicle."

Tr. 561-563.

{¶ 42} The narration continued briefly without video point specifications:

[T]he vehicle is stopped and it looks like that rider * * * may be speaking with the occupants of the vehicle. * * * The Chrysler has now pulled forward again just out of the view of the camera. * * * The individual in the white t-shirt is now speaking with the black vehicle at the bottom of the screen. * * * It looks like that [black] vehicle opened the back door of that vehicle and then it did disappear from the bottom of the screen.

Tr. 563-564.

{¶ 43} Pierse continued:

22:57 – The silver Chrysler 300 is traveling eastbound on Anita Kennedy * * * [and] was backing into a parking spot on the side of the

road right there [indicating]. * * * [A] lighter colored vehicle traveling eastbound on Anita Kennedy, and this is the video—the vehicle that [the victim] was a passenger in.

23:36 – There's a person that's exiting the rear passenger side of that vehicle, and that's believed to be the victim. * * * [The victim] was on the south side of the road when he exited the vehicle and then returned to the north side of the road going in front of that vehicle. * * * So [the victim] goes northbound towards the area in which his dirt bike was later found and we see somebody approach him and extend their arm and shoot.

Tr. 565-567. Pierse was unable to locate the Chrysler in any of the CPD videos after the shooting. The state did not inquire about CMHA videos.

{¶ 44} Pierse confirmed during cross-examination that the video clips did not depict the person riding the dirt bike near the Burten Center around the time of the first shooting incident. She also agreed that the dirt bike rider and black SUV arrived about the same time and came from the same direction. The Chrysler arrived from the opposite direction, and the dirt bike rider eventually entered the SUV and road away. There were no video clips showing where the SUV went. There was a brief interaction of a few seconds between the Chrysler and what appeared to be the person riding the dirt bike. Tr. 583.

{¶ 45} Forensic DNA analyst Christine Scott ("Scott") was employed by the Cuyahoga County Regional Forensic Science Laboratory in the medical examiner's office. She examined evidence for DNA, interpreted the DNA profiles recovered, and prepared reports. Scott examined body swabs from the victim, the victim's clothing, the left- and right-hand handlebar of the dirt bike, casings, and the gas can recovered from the scene. Swabs from parts of the victim's body and clothing

indicated a mixture of DNA with the victim's. The handlebars contained a mixture of the victim and four other individuals. An insufficient amount of DNA was obtained from the gas can and bullet casings. A DNA match with Shepard was identified on the left and right handlebar of the dirt bike.

{¶ 46} Edward Lattyak ("Lattyak") was the supervisor of the firearms and toolmark unit of the Cuyahoga County Medical Examiner's regional forensic science laboratory. Lattyak examined the bullet casings, a fired bullet, and several bullet fragments. He concluded that the bullets were fired from a Glock firearm but no firearm was submitted. Examination of the National Integrated Ballistic Information Network database revealed a potential match for one of the bullet casings that indicated the same weapon may have been used in several other shooting events but none on the same day.

{¶ 47} Special Agent Andrew Burke ("Agent Burke") of the Federal Bureau of Investigation was assigned to the CPD Homicide Unit's Violent Crime Task Force. Agent Burke performed a forensic software download of data from two iPhones that belonged to the victim. One phone had very little call activity, no data for the period of the shooting, and no references to Shepard. The other phone with a number ending in 1523 appeared to be the victim's primary phone. The investigation focused on data for the period of September 19-23, 2021.

{¶ 48} The shooting occurred "around 9:10 p.m." Tr. 628. Seven consecutive outgoing calls were made by the victim to the same number ending in 9510 between 8:49 p.m. and 9:03 p.m. The 8:53 p.m. and 8:55 p.m. calls lasted a

minute and 12 seconds, and the others may not have connected, including the last call at 9:03 p.m. The 9510 number called the victim's 1523 number two days before the shooting.

**{¶ 49}** CPD attempted to identify the owner of the 9510 number. There was no name associated with the number in the victim's phone, no text message exchanges, and no text references to Shepard. A subpoena to the phone provider revealed there was no subscriber name listed for the 9510 prepaid phone account. However, phone records were secured for 9510 and reviewed for call patterns during the relevant time frame.

**{¶ 50}** A search was conducted of the Securus jail-phone records for calls made by Shepard to numbers of interest selected from the call pattern reviews. Six calls were discovered from Shepard to a number ending in 1949 between November 11 and December 27, 2021, a number that also appeared in the 9510 records (exhibit No. 159). Shepard also made calls that appeared in the 9510 phone records to numbers ending in 8220 and 4520 (exhibit Nos. 160, 161).

**{¶ 51}** Agent Burke confirmed during cross-examination that there were no incoming calls to the victim from the 9510 number the day of the shooting. There also was no evidence of who possessed the 1949, 2220, and 4520 numbers at the time Shepard called them. And there was no direct evidence that Shepard owned the 9510 phone.

**{¶ 52}** Detective Shane Bauhof ("Det. Bauhof") of CPD's Fourth District Homicide Unit worked on the case with detectives Gonzalez and Diaz. Through

canvassing by the CPD gang-impact unit and CMHA, along with videos provided by CMHA, Det. Bauhof "learned of a subject that delivered [the victim's] dirt bike to the area and * * * why [the victim] was instructed to go to Garden Valley [by East 70th Street and Kinsman Avenue] to pick up his dirt bike" though the victim lived in the East 38th Street area. Tr. 673. At that point, Shepard was suspected of being the dirt bike rider.

{¶ 53} Det. Bauhof narrated his perspective of the CMHA motion-activated camera portion of the video compilation that echoed the perspectives presented by Pierse of the events at the Burten Center and on Anita Kennedy Road where the victim's shooting occurred. The detective later in his testimony identified the bike rider as Shepard in video excerpts and still shots of the video.

{¶ 54} Det. Bauhof added that CPD was unable to identify the license plates on the black SUV and Chrysler and that when the Chrysler backed up beside the bike rider, there appeared to be a brief conversation and a gesture by the bike rider toward the place where the bike had been left. The Chrysler parked directly in front of that area. Police assumed the shooter entered the Chrysler, which pulled off quickly afterward.

{¶ 55} Det. Bauhof also testified regarding still shots of the video scenes including Doe, Doe's shooter, and the victim at the Burten Center. The similarity of the attire between Doe and the victim and the presence of the Chrysler near the Burten Center bolstered the conclusion that Doe was a victim of mistaken identity and that the victim was the target.

{¶ 56} CPD received tips regarding the Chrysler that had a distinctive oversized sunroof. A tip directed CPD to an individual named Cam who had a Chrysler 300 but disposed of it after the shooting. A picture secured from social media was identified by the gang-impact unit as Rashad Bilal ("Bilal") who owned a light blue Chrysler 300 that fit the description. Bilal was the target of a narcotics investigation. Despite efforts including checking CPD's street license reader records, the Chrysler was not located.

{¶ 57} Cell phone records revealed calls to and from Bilal and the 9510 number CPD attributed to Shepard on multiple days prior to the shooting. The day of the shooting, Bilal called 9510 at 7:36 p.m., which was shortly before the Burten Center shooting at 7:45 p.m., again at 8:08 p.m., and at 3:39 a.m., the morning after the shooting (exhibit Nos. 155 and 181.) Records show calls were made from the 9510 number to Bilal on September 16, the day of the shooting, at 2:46 p.m., 5:52 p.m., and 8:08 p.m.

{¶ 58} Det. Bauhof also testified that the date September 16, 2021, became significant because that was the date that James Greathouse ("Greathouse") was either indicted or a warrant was issued for arson in connection with a homicide. The arson was for a "vehicle that listed back to" the victim. Tr. 716. At the time of the victim's shooting, Greathouse was in Texas. The detective said cell phone records for the 9510 number and for Bilal contained calls with a Texas area code. Police determined that Shepard, Bilal, and Greathouse were associates but were unable to identify the owner of the Texas phone.

**{¶ 59}** During cross-examination, the defense emphasized that the evidence was circumstantial and based on the state's speculation. Bilal was not identified as the driver of the Chrysler and was still considered a suspect in the shooting but had not been arrested or charged at the time of trial. CPD also provided no proof that the car was titled to Bilal. The investigation was still pending at the time of trial.

**{¶ 60}** The state rested; the defense motion for judgment of acquittal under Crim.R. 29 was denied. The defense rested, and the renewed Crim.R. 29 motion was denied.

### 3. Analysis

**{¶ 61}** The state argued that Shepard aided and abetted the offenses. Shepard contends that the evidence is insufficient to establish the requisite elements of the convictions based on complicity. R.C. 2923.03(A) provides in pertinent part that [n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." R.C. 2923.03 (A)(2). "[C]onviction of the principal offender is not a prerequisite to finding a defendant guilty of complicity." *State v. Gardner*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, ¶ 34, citing R.C. 2923.03(B) ("It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender."). The state is not required to establish the principal's identity to convict an offender of complicity, but only that the state proves that a principal committed the offense. *Id.*, citing R.C. 2923.03(C) and *State v. Perryman*, 49 Ohio St.2d 14, 358 N.E.2d 1040 (1976), paragraph four of the syllabus, *vacated*

*on other grounds, sub nom., Strodes v. Ohio*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

{¶ 62} Counts 2, 3, and 4 merged into Count 1, and Shepard was sentenced on one three-year gun specification and Count 1, aggravated murder, only, "so we consider the sufficiency of the evidence on [that conviction] only." (Footnote omitted). *McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, at ¶ 25, citing *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 24 ("A 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty [emphasis sic]."). *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 138 (merger of kidnapping count with aggravated-robbery and aggravated-burglary counts moots sufficiency-of-the-evidence claim regarding kidnapping count).

{¶ 63} R.C. 2923.03, entitled "Complicity," does not define aiding and abetting. The Ohio Supreme Court has stated that to aid or abet means to "'[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001), quoting *Black's Law Dictionary* 69 (7th Ed.1999).

> "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson* at syllabus. "'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). "The court must view the evidence

in the light most favorable to the prosecution and defer to the trier of fact on questions of credibility and the weight assigned to the evidence. *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 146." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132.

*McFarland* at ¶ 29.

**{¶ 64}** R.C. 2903.01(A), aggravated murder, provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." "The element of prior calculation and design 'require[s] a scheme designed to implement the calculated decision to kill.'" *Id*. at ¶ 31, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

**{¶ 65}** There is substantial support in the record that the Chrysler was in the immediate vicinity of the Burten Center during the shooting. The shooter followed the route taken by the victim into the area that the victim had just exited and shot Doe whom CPD believe was mistaken for the victim. Witness Terrell testified that the victim called someone on his cell phone and asked where the bike had been left as he exited her car. The cell phone evidence confirmed that the call was made to the 9510 cell phone number. The cell phone evidence also established that the owner of the Chrysler and the 9510 number made calls to each other the day of the shooting. Shepard's DNA was found on the handles of the bike.

{¶ 66} The CMHA motion-activated video excerpts showed the dirt-bike rider entering eastbound into the area followed by a dark SUV that waited for the rider. The Chrysler appeared from the opposite direction and stopped by the black SUV. The drivers' sides of the vehicles were aligned for a few moments, then the Chrysler pulled off.

{¶ 67} The rider approached from behind the trees heading east toward the black SUV as the Chrysler entered the picture heading west and slowly backed up with the rider walking alongside the Chrysler's passenger side. They stopped and interacted briefly, and the rider gestured to the area where the bike was left. The rider entered the black SUV and departed. The Chrysler drove out of view, returned heading eastbound, parked in front of the place that the bike had been left, and turned off its lights.

{¶ 68} Witness Terrell's vehicle entered heading eastbound and stopped in the middle of the street to the left of the parked Chrysler facing west. The victim exited as he asked the individual on the cell phone where the bike was located. The motion-activated camera showed the victim quickly cross the street in front of Terrell's car and behind the parked Chrysler to get the bike. The shooter immediately followed and began firing. The shooting stopped, and the Chrysler pulled away.

{¶ 69} Shepard argues that the state's case was based on mere speculation and circumstantial evidence and that mere presence at the scene is not enough to establish complicity. "'"Participation in criminal intent may be inferred from

presence, companionship, and conduct before and after the offense is committed.'"'"

*Gardner*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, at ¶ 35, quoting *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). Additionally, "[a]iding and abetting may be shown by both direct and circumstantial evidence." *Id.*, citing *State v. High*, 2018-Ohio-2236, 115 N.E.3d 702, ¶ 23 (8th Dist.).

**{¶ 70}** The trial court properly instructed the jury on the definitions of circumstantial and direct evidence. The jury was also informed:

> It is your job to decide how much weight to give to the direct and the circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all of the evidence, both direct and circumstantial, and give it whatever weight that you believe it deserves.

Tr. 814.

**{¶ 71}** We add that this court has held:

> "To be convicted as an aider and abettor such person must: (1) engage in an overt act 'with a view' towards producing the result for which he [or she] is held; and (2) such person must himself [or herself] possess the felonious intent that the principal possesses." *State v. Boigner*, 8th Dist. Cuyahoga No. 34514, 1976 Ohio App. LEXIS 7630, 3 (Mar. 25, 1976), citing *Woolweaver v. State*, 50 Ohio St. 277, 288, 34 N.E. 352 (1893). "It is not necessary that the accused be in a position to foresee the precise consequence of his [or her] conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his [or her] conduct." *State v. Losey*, 23 Ohio App.3d 93, 95-96, 23 491 N.E.2d 379 (10th Dist.1985).

*Gardner* at ¶ 33.

**{¶ 72}** Viewing the evidence in a light most favorable to the prosecution and giving due deference to the trier of fact on questions of credibility and adequacy, this court does not find that the evidence in this case was insufficient as a matter of law to support the elements of complicity to aggravated murder. This court also does not find that this is the exceptional case where the jury clearly lost its way. The weight of the evidence supports the conviction.

**{¶ 73}** The first and second assignments of error are overruled.

### B. Hearsay

### 1. Standard of Review

**{¶ 74}** "A trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and whether it is admissible hearsay." *State v. Wingfield*, 8th Dist. Cuyahoga No. 107196, 2019-Ohio-1644, ¶ 29, citing *Solon v. Woods*, 8th Dist. Cuyahoga No. 100916, 2014-Ohio-5425, ¶ 10. "We therefore will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of discretion and the defendant suffers material prejudice." *Id.*, citing *Woods*, citing *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

**{¶ 75}** An "abuse of discretion" occurs where "a court exercise[s] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. No court has discretionary authority to apply the law incorrectly, which is why courts apply a de novo standard when reviewing issues of

law.  *Id.* at ¶ 38, citing *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 30; *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 26 (2d Dist.).

### 2. Analysis

**{¶ 76}** Shepard contends that the trial court erred when, over defense objections, it allowed the state to elicit inadmissible hearsay testimony resulting in the deprivation of due process and a fair trial under the state and federal constitutions.  We disagree.

**{¶ 77}** "Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'"  *Id.* at ¶ 30, quoting Evid.R. 801(C). "If either element is missing — (1) a statement or (2) offered for its truth — the testimony is not hearsay." *Id.*, citing *State v. Holt*, 9th Dist. Lorain No. 97CA006985, 1999 Ohio App. LEXIS 4149, 8 (Sept. 8, 1996).

**{¶ 78}** Shepard argues that the admission of the evidence amounted to unfair prejudice that outweighed its probative value, in violation of Evid.R. 403(A). "Evid.R. 403(A) mandates the exclusion of even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." *Hunt v. E. Cleveland*, 8th Dist. Cuyahoga No. 105953, 2019-Ohio-1115, ¶ 46.  In addition,

> [a] judge has "broad discretion" to admit or exclude evidence under Evid.R. 403(A), and we will not reverse the ruling absent a "clear abuse" of that discretion.  This standard of review flows from the uniquely factual nature of the Evid.R. 403(A) determination, which

must balance probative value against the risk of unfair prejudice in light of all the circumstances. "The issue of whether testimony is relevant or irrelevant, confusing or misleading, is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury."

*State v. Hruby*, 8th Dist. Cuyahoga No. 81303, 2003-Ohio-746, ¶ 8, quoting *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 29, and *Columbus v. Taylor*, 39 Ohio St.3d 162, 164, 529 N.E.2d 1382 (1988).

**{¶ 79}** Shepard also states that the testimony was substantially more prejudicial than probative, needlessly cumulative, and showed inadmissible crimes.

Evid.R. 404(B) precludes the admission of evidence regarding a defendant's prior criminal acts when such evidence is offered to prove the defendant's character and that his actions were in conformity with that character. *State v. Herring*, 8th Dist. Cuyahoga No. 104441, 2017-Ohio-743, 81 N.E.3d 133, ¶ 12. However, evidence of the defendant's prior criminal acts may be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).

*State v. Nunez*, 2017-Ohio-4295, 92 N.E.3d 294, ¶ 17 (8th Dist.).

**{¶ 80}** Shepard argues the testimony of Det. Bauhof was offered to prove the truth of the matter asserted that the two alleged suspects had a motive to kill the victim and that Mr. Shepard, as their associate, shared that intent. Appellant's brief, p. 29.

**{¶ 81}** Shepard objected as follows:

State: As you began to investigate this case, Detective, were you looking for some information with respect to a motive, like who would want to kill [the victim]?

Witness: Yes.

State: Did you develop a theory throughout your investigation with respect to that?

Counsel: Objection.

Tr. 710.

{¶ 82} Discussed at sidebar and proffered for the record, counsel argued that a response would involve the detective's purely speculative theory of how people and events were connected and who had a motive to kill the victim, specifically that the victim loaned a car to someone, a murder occurred, the vehicle was torched, and the victim was killed because he was a witness. No charges had been filed against anyone. Counsel asserted that the information should not be introduced by the detective's theory and would confuse the jury. The trial court advised that the state would be allowed to ask "very specifically if there were additional steps in the investigation, and that's it." Tr. 712. Both parties responded, "[O]kay." *Id.*

{¶ 83} The trial court continued, "I am not going to allow the state to link it or create it as a motive, but outlining an investigation and what occurred is logical * * * it's the jury's purview to make any connection that they would choose to make." Tr. 714. The state was advised, "[Y]ou can withdraw the question and then just simply ask what additional steps were taken if there's relevance to that date, and move forward just in a straightforward manner." Tr. 715. Defense counsel stated, "Okay."

{¶ 84} The defense conducted a thorough cross-examination and recross-examination addressing the information provided by Det. Bauhof during direct and

redirect examination. Counsel walked through perspectives of what the exhibits did and did not reveal for the jury's consideration.

{¶ 85} Shepard further asserts that withdrawal of the question was not enough because the jury had heard the withdrawn question and "it was nearly impossible for the jury not to make the connection that this was the detective's theory of who had a motive to kill the victim" and that "the state implied to the jury" through the testimony "that these unknown perpetrators could possibly either be Bilal or Greathouse." Appellant's brief, p. 28.

{¶ 86} The testimony in the instant case was presented to establish Det. Bauhof's investigation of the events and individuals involved in the shooting of the victim. *State v. Henderson*, 8th Dist. Cuyahoga No. 88185, 2007-Ohio-2372, ¶ 45. *See also State v. Dakdouk*, 8th Dist. Cuyahoga No. 77701, 2001 Ohio App. LEXIS 741 (Mar. 1, 200) (court held that the admission of the detective's testimony about an anonymous tip was not inadmissible hearsay evidence because it was not offered to prove the truth of the matter asserted, but rather to merely establish the detective's reason for investigating the appellant); *State v. Carpenter*, 6th Dist. Lucas No. L-05-1219, 2006-Ohio-4296, ¶ 15 ("When a statement is offered into evidence to explain the conduct of a police officer's investigation of a crime, it is not considered to be hearsay."); *State v. Craft*, 12th Dist. Butler No. CA2006-06-145, 2007-Ohio-4116, ¶ 51 ("Where a statement made by an individual to a law enforcement officer is offered to prove the officer's subsequent investigative activities, the statement does not constitute hearsay and is properly admissible.").

**{¶ 87}** This court does not find that the trial court abused its discretion. The third assignment of error is overruled.

## IV. Conclusion

**{¶ 88}** The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

MICHELLE J. SHEEHAN, J., and
LISA B. FORBES, J., CONCUR